UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

|  |  |
|---|---|
| WENDY TOLMAC<br><br>                Plaintiff,<br><br>   v.<br><br>Experian Information Solutions, Inc.;<br>Equifax Information Services, LLC;<br>TransUnion, LLC; Select Portfolio<br>Servicing, Inc., Associated Bank, N.A.<br><br>                Defendants. | CASE NO. 2:23-cv-00982<br><br>COMPLAINT FOR DAMAGES:<br><br>1. Violation of Fair Credit Reporting Act |

COMES NOW Plaintiff Wendy Tolmac (hereinafter "Plaintiff"), an individual, based on information and belief, to allege as follows:

## INTRODUCTION

1. This case arises under the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b), 15 U.S.C. § 1681e(b), 15 U.S.C. § 1681i(a)(2)(A)), 15 U.S.C. § 1681i(a)(4)), and 15 U.S.C. §1681i(a)(5)(A)).

2. Plaintiff seeks redress for the unlawful and deceptive practices committed by the above captioned Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's mortgage with Select Portfolio Servicing (hereinafter "SPS"), Associated Bank (hereinafter "Associated"), and Bank Mutual (hereinafter "BM") (Associated acquired Bank Mutual in early 2018).

3. Here, SPS continues to report inaccurate and incomplete information regarding Plaintiff's mortgage account.

4. SPS's reporting of the account is wholly incomplete and misleading.

5. Specifically, SPS continues to report an incomplete payment history regarding Plaintiff's timely payments on the account – making it appear that Plaintiff is behind and/or not making timely payments on her mortgage.

6. In addition, both Associated and BM are reporting that Plaintiff's mortgage has been included/discharged in bankruptcy and not reporting any accurate account information regarding the status of the account.

7. Such reporting is misleading and adversely impacts Plaintiff's credit worthiness.

8. Plaintiff's credit reports have been disseminated to third parties since the completion of her Chapter 13 bankruptcy.

9. Plaintiff's credit has also been damaged as a result of the inaccurate and misleading reporting.

10. Plaintiff has been denied credit specifically due to the inaccurate reporting of the account tradelines.

11. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system.

12. Creditors know that by deviating from recognized credit reporting standards consumers will have difficulty raising their credit scores and improving their credit worthiness.

## JURISDICTION & VENUE

13. Plaintiff re-alleges and incorporates herein by reference the allegations in each and every paragraph above, fully set forth herein.

14. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1367, and 15 U.S.C. § 1681

15. This venue is proper pursuant to 28 U.S.C. §1391(b)(1).

## GENERAL ALLEGATIONS

16. Plaintiff alleges that each and every Defendant is familiar with credit reporting industry standards and subscribes thereto.

17. Plaintiff alleges that each and every Defendant understands that deviation from credit reporting industry standards can and often does result in denial of credit, higher interest rates, and prompts those making credit decisions to draw a more negative inference from the reported data than if the Defendant reported in accordance with the recognized industry standard.
18. Plaintiff alleges that all actions alleged herein by Defendants were done knowingly, intentionally, and in reckless disregard for credit reporting industry standards in an attempt to purposefully undermine Plaintiff's attempt to improve her FICO Score.
19. In the alternative Plaintiff alleges that the actions of each and every Defendant were the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

### FICO, Inc.

20. FICO is a leading analytics software company with its principal headquarters located in San Jose California. FICO has over 130 patents related to their analytics and decision management technology, and regularly uses mathematical algorithms to predict consumer behavior including credit risk.
21. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent of lending decisions.
22. A FICO score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.
23. Base FICO Scores range from 300 to 850, while industry-specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.
24. Different lenders use different versions of FICO Scores when evaluating a consumer's credit worthiness.
25. There are 28 FICO Scores that are commonly used by lenders.

26. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies (CRAs).
27. The three largest CRAs are Experian Information Solutions, Inc.; Equifax Information Services, LLC, and TransUnion, LLC.
28. FICO does not control what information is provided in a consumer's credit report. Instead, the scoring models or algorithms are based on the premise that information provided by the CRAs is accurate and complies with credit reporting industry standards.
29. There are five key factors that a FICO Score considers: 1) Payment History, 2) Amount of Debt, 3) Length of Credit History 4) New Credit and 5) Credit Mix.
30. Each of the five factors is weighed differently by FICO.
31. 35% of a consumer's FICO Score relates to payment history, 30% relates to the amount of debt, 15% relates to the length of credit history, 10% relates to new credit, and the last 10% relates to a consumer's credit mix or the different types of debts reported.
32. Payment history refers to whether a consumer has paid their bills in the past, on time, late or missed payments. The more severe, recent, and frequent the late payment information, the greater the impact on a FICO Score. Public record items such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.
33. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.
34. Once a delinquent account has been remedied the longer the account stays current the more a consumer's FICO Score should increase.
35. FICO Scores are entirely dependent upon information provided by data furnishers (DFs) to CRAs.

//
//

### e-OSCAR

36. E-OSCAR is the web-based Metro 2 compliant system developed by Experian Information Solutions, Inc.; Equifax Information Services, LLC; TransUnion, LLC and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

37. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification (ACDV) via e-Oscar to the DF.

38. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g. "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

### Metro 2

39. The Consumer Data Industry Association is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries.

40. The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by the CDIA in an effort to universally report debts in a particular manner that is understood to be the most accurate way in which to report a debt. Specifically, Metro 2 format was designed to allow reporting of the most accurate and complete information on consumer's credit history.

41. The CDIA's Metro 2 format is the credit reporting industry standard for accurate credit reporting.

42. The credit reporting industry at large depends upon Metro 2 and the CDIA's recommendations for reporting debt accurately.

43. The CDIA is *the* expert on accurate credit reporting. In support of her allegations Plaintiff avers the following:

    a. The CDIA offers a FCRA certificate program for all CRAs.
    b. The CDIA offers a FCRA awareness program for all CRAs.
    c. The CDIA offers a FCRA Certificate program for DFs.
    d. The CDIA offers a FCRA awareness program for DFs.

e. The CDIA offers a Metro 2 Learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 Format as well as the relationship between multiple fields.

f. The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and Transunion.

g. The CDIA developed a credit reporting resource guide for accurately reporting credit.

44. The CDIA's Metro 2 is accepted by all CRAs.

45. The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide (CRRG).

46. The CRRG outlines the industry standards for most accurately reporting debts using Metro 2.

47. The three main credit bureaus helped draft the CRRG.

48. The CRRG is not readily available to the public. It can be purchased online for $229.45.

49. Even if a buyer is ready willing and able to pay for the CRRG, the CDIA will NOT grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

50. When FICO calculates credit scores the algorithms use Metro 2 information based on industry standards established by the CDIA.

51. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

52. If the Metro 2 data received by FICO deviates from industry standards an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower a consumer will be considered a higher credit risk resulting in less favorable lending terms.

53. All three major CRAs are members of the CDIA

54. The CDIA is on record that they know, understand, and accept mortgages are generally non-dischargeable under 11 U.S.C. §1328(c)(1) and 11 U.S.C. § 1322(b)(5).

### Consumer Information Indicator

55. When a consumer files for bankruptcy protection certain credit reporting industry standards exist.
56. Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's credit worthiness.
57. The Consumer Information Indicator (CII) is a critical field in the Metro 2 Format that indicates a special condition that applies to a specific consumer.
58. Under Metro 2 the CII must be reported only on the consumer to whom the information applies.
59. It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.
60. In the consumer bankruptcy context CII Metro 2 Code "A" denotes that a petition for Chapter 7 has been filed, is active, but no discharge has been entered.
61. CII Metro 2 Code "D" indicates that a Chapter 13 petition has been filed, is active, but no discharge entered. This is usually translated on a consumer credit report as "Wage Earner Plan" or "WEP" in the "Account Status" portion of a trade line. Such reporting alerts any potential lender that the account is no longer in a collectable status but is being handled by a Chapter 13 trustee.
62. The CII Metro 2 Code "Z" indicates that a bankruptcy petition has been filed but the chapter is undesignated/unknown.
63. The CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.
64. The CII Metro 2 Code "H" denotes that a Chapter 13 bankruptcy has been discharged.
65. The CII Metro 2 Code "Q" is used when a bankruptcy plan is complete and will remove prior bankruptcy codes on the account; the CII Q is used on liabilities that are not discharged in bankruptcy (such as a mortgage).

66. The CII field is a critical field for consumers and directly relates to and impacts a consumer's credit worthiness.

67. Failure to update the CII to a "Q" on a secured non-discharged debt results in it appearing that a consumer, like Plaintiff, included an account in a bankruptcy proceeding despite not having done so.

68. It also results in the account being calculated as a major derogatory or adverse account despite the fact it was not included or discharged.

69. The result lowers a consumer's credit score and makes a consumer appear much less credit worthy.

**Plaintiff's Dispute**

70. On February 15, 2023 Plaintiff ordered a credit report from Experian, Equifax, and TransUnion to ensure proper reporting by Plaintiff's creditors after her Chapter 13 bankruptcy was completed.

71. Plaintiff noticed various delinquent and adverse trade lines on her February 15, 2023 credit report. SPS was not reporting complete information regarding her mortgage, such as SPS failing to report all of Plaintiff's timely mortgage payments. In addition, Associated was reporting that the mortgage account was included/discharged in bankruptcy.

72. In response, Plaintiff disputed the SPS and Associated tradelines with Experian, Equifax, and TransUnion via certified mail in March of 2023.

73. Plaintiff's dispute letters specifically put the Defendants on notice that the SPS account was open and current with all timely payments having been made.

74. Plaintiff's letters further informed the CRAs that the Associated account should not be reporting that it was included / discharged in bankruptcy as that was incorrect.

75. Plaintiff's dispute letter further stated that the payment history was incorrect and supported the assertion with verification of timely payments made to SPS.

76. Plaintiff is informed and believes that each CRA received Plaintiff's dispute letter and in response sent Plaintiff's dispute to SPS and Associated via an ACDV through e-OSCAR.

77. On April 28, 2023 after the statutory time period had elapsed for Plaintiff to receive a reinvestigation report from the credit Bureaus, Plaintiff ordered a second credit report from Experian, Equifax, and TransUnion for the sole purpose to ensure Plaintiff's accounts with SPS had in fact been updated.

**Inaccuracy –SPS**

78. Plaintiff was frustrated to see that Defendant SPS did not properly update her mortgage account.

79. SPS was still reporting an incomplete payment history regarding the account, including as recently as March of 2023.

80. SPS's reporting is inaccurate because Plaintiff is not behind on her mortgage and has consistently made on time payments.

81. In addition, the SPS mortgage account is open and current, with an outstanding balance, as Plaintiff is continuing to make her ongoing timely mortgage payments.

82. SPS's reporting is entirely incomplete, misleading and technically inaccurate.

83. The reporting is incomplete because the report lacks any updates on the account and payment history.

84. The reporting is inaccurate and misleading because SPS is not correctly reporting the payment history on Plaintiff's mortgage account.

85. SPS has entirely failed to report Plaintiff consistent on time mortgage payments or report an accurate account status.

86. Such reporting remains wholly incomplete and would lead lenders to question whether or not Plaintiff has made mortgage payments consistently.

87. Thus, such reporting makes Plaintiff less credit worthy because it appears that she is not making timely payments on her mortgage.

**Willfulness**

9

Case 2:23-cv-00982-JPS    Filed 07/22/23    Page 9 of 18    Document 1

88. This was not a negligent act by Defendant SPS but instead an intentional act to purposefully undermine Plaintiff's ability to effectively restore her credit.
89. SPS's reporting makes Plaintiff appear less credit worthy because the lack of any update on the account makes it appear that Plaintiff is not making timely payments on the account.
90. SPS knows that its reporting must be accurate and complete.
91. SPS, with knowledge of Plaintiff dispute, chose not to update Plaintiff's credit report and instead still reported that payments were not made on the account.
92. Such a scheme directly undermines the integrity of the credit reporting system at large.

### Inaccuracy – Associated

93. Plaintiff was frustrated to see that Defendant Associated did not properly update her mortgage account.
94. Associated was still reporting an incomplete payment history regarding the account as well as reporting that the account was included/discharged in bankruptcy.
95. Associated also failed to update any reporting regarding the BM account after it acquired BM in 2018.
96. The reporting is inaccurate because Plaintiff's account was not discharged through the chapter 13 filing.
97. The reporting is entirely incomplete, misleading and technically inaccurate.
98. The reporting is incomplete because the report lacks any updates on the account and payment history.
99. Such reporting remains wholly incomplete and would lead lenders to question whether or not Plaintiff's account was discharged in bankruptcy.
100. Thus, such reporting makes Plaintiff less credit worthy because it appears that her mortgage account was included/discharged in bankruptcy.

### Willfulness

101. This was not a negligent act by Defendant Associated but instead an intentional act to purposefully undermine Plaintiff's ability to effectively restore her credit.

102. Associated knows that its reporting must be accurate and complete.

103. Associated, with knowledge of Plaintiff dispute, chose not to update Plaintiff's credit report and instead continue to report that the account was included/discharged in bankruptcy.

104. Such a scheme directly undermines the integrity of the credit reporting system at large.

**Damages**

105. As a result of the incorrect reporting, Plaintiff has suffered economic loss, diminished credit, and emotional harm.

106. SPS and Associated's inaccurate reporting has been transmitted to third parties since Plaintiff completed her Chapter 13 case and negatively impacted Plaintiff's ability to obtain and rebuild her credit.

107. Specifically, Plaintiff has been unable to qualify credit because her prospective lenders have informed Plaintiff that the negative/adverse reporting regarding her mortgage account with SPS and Associated prevents the application from being approved and resulted in a denial.

108. Both Associated and SPS's reporting has diminished Plaintiff's credit score.

109. The actions of Experian, Equifax, TransUnion, SPS, and Associated, as alleged herein are acts in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

**FIRST CAUSE OF ACTION**
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))
Against Defendants Experian, Equifax, and TransUnion)

**Experian Information Solutions, Inc., Equifax Information Services, LLC, TransUnion, LLC – Failure to Assure Credit Reporting Accuracy.**

110. Plaintiff realleges and incorporates herein the allegations in each and every paragraph above as though fully set forth herein.

111. Experian, TransUnion, and Equifax violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files it published and maintained concerning Plaintiff.

112. Had Experian, TransUnion, and Equifax maintained reasonable procedures to assure maximum accuracy Experian, TransUnion, and Equifax would never have allowed Defendant SPS to report the account as described herein.

113. Plaintiffs informed Experian, TransUnion, and Equifax that the information reported by SPS was incorrect because Plaintiff provided verification that SPS account was open and timely payments were made.

114. The verification provided by Plaintiff came directly from SPS.

115. Further, Plaintiff explained that the Associated account was not included / discharged in bankruptcy as her mortgage remained current.

116. Instead, the account remains unchanged.

117. As a result of Experian, TransUnion, and Equifax's violation of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: diminished credit, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**Willfulness**

118. The violations described herein by Experian, TransUnion, and Equifax were willful, specifically the Credit Bureaus have intentionally and purposefully set up a system where inaccuracies are not only probable but inevitable.

119. In 2012 the FTC reported that 1 in 5 consumer credit reports contains a material error.

120. Such a finding should shock the conscience.

121. When those errors are disputed Equifax, TransUnion, and Experian intentionally send consumer disputes to employees who do not live within the continental United States.

122. This is intentionally done to hide and or subvert a consumer's ability to confront individuals directly responsible for approving accurate reporting.

123. Such a policy also inevitably leads to disputes going unresolved as these employees for Defendants Experian, TransUnion, and Equifax receive little to no training concerning how to accurately report consumer debt.

124. Instead, these employees are simply instructed to parrot whatever information a data furnisher provides regardless of whether or not that information is accurate. *See Saez v.*

*Trans Union,* LLC, 621 F. Supp. 2d 1074, 1083, 1088 (D.Or. 2007); *Grigoryan v. Experian Info. Sols.*, Inc., 84 F. Supp. 3d 1044, 1091 (C.D. Cal. 2014); *Haykuhi Avetisyan v. Experian Info Sols.*, No. CV 14-05276-AB (ASX)

125. Experian, TransUnion, and Equifax employees are regularly expected to review and approve over 90 disputes per day rendering less than five minutes to review, investigate, and respond to each dispute received.

126. Experian, TransUnion, and Equifax have intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

127. Experian, TransUnion, and Equifax also allowed SPS and Associated to report the account with inaccurate information despite specifically being told in the dispute letter why the information SPS and Associated was reporting was incorrect.

128. Experian, TransUnion, and Equifax are members of the consumer data industry association and therefore are familiar with the reporting guidelines regarding payments made on mortgage accounts.

129. Experian, TransUnion, and Equifax are allowing SPS and Associated to report in a manner they know is factually and legally inaccurate.

130. Plaintiff's dispute provided verification that SPS received and cashed each timely mortgage payment.

131. Consequently, Defendants Experian, TransUnion, and Equifax are liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

132. In the alternative, Experian, TransUnion, and Equifax were at least negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

133. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian, TransUnion, and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

//

//

## SECOND CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b))
Against All Defendants)

**SPS and Associated – Failure to Reinvestigate.**

134. Plaintiff realleges and incorporates herein the allegations in each and every paragraph above as though fully set forth herein.

135. 15 U.S.C. §§ 1681s-2(b) and 1681i-(a)1 prohibit furnishers from providing any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate or misleading and requires a furnisher to update and or correct inaccurate information after being notified by a consumer reporting agency of a dispute by a consumer.

136. Defendants Associated and SPS violated section 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading and inaccurate account information.

137. The CRAs provided notice to Associated and SPS that Plaintiff was disputing the inaccurate and misleading information, but Associated and SPS failed to conduct a reasonable investigation of the information as required by the FCRA.

138. Based on Plaintiff's dispute, Associated and SPS should have known that its reporting was incomplete as Plaintiff's dispute letters highlighted the problems with the tradeline.

139. The most basic investigation would simply involve reading Plaintiff's dispute letters.

140. Plaintiff alleges both Associated and SPS did not review well established industry standards for credit reporting.

141. If Associated and SPS had reviewed such standards, both would have seen its reporting was not in compliance and in accordance with the CRRG and consequently inaccurate and or incomplete.

142. Moreover, had SPS done any investigation whatsoever it would have uncovered that its incomplete payment history was incorrect as its own records would support Plaintiff's dispute that all payments were timely made on the account.

143. If Associated performed any type of investigation it would have realized the account was not included/discharged in bankruptcy and instead was current.

14

Case 2:23-cv-00982-JPS    Filed 07/22/23    Page 14 of 18    Document 1

144. Plaintiff further alleges that Associated and SPS have not properly trained those directly investigating disputes on Metro 2 generally or credit reporting industry standards and as such have developed reckless policies and procedures.

**Experian, TransUnion and Equifax – Failure to Reinvestigate Disputed Information.**

145. Plaintiff re-alleges and incorporates herein the allegations in each and every paragraph above as though fully set forth herein.

146. After Plaintiff disputed the account mentioned above, Experian, TransUnion, and Equifax were required to conduct a reasonable investigation and to delete any information that was not accurate under 15 U.S.C. § 1681i-(a)1.

147. Experian, TransUnion, and Equifax failed to conduct a reasonable investigation and failed to correct the misleading and or inaccurate statements on the account within the statutory time frame or at all.

148. Experian, TransUnion, and Equifax could not have possibly done any type of reasonable investigation into this matter as Plaintiff explicitly explained that the SPS account payments were current and provided verification of those payments.

149. Plaintiff alleges that Experian, TransUnion, and Equifax have its own independent duty to conduct a reasonable investigation 15 U.S.C. § 1681i-(a)1.

150. Experian, TransUnion, and Equifax are not passive entities bound to report whatever information a DF provides.

151. Given the aforementioned, Plaintiff alleges that Experian, TransUnion, and Equifax can and do suppress inaccurate information from being reported when DFs provide inaccurate information.

152. Experian, TransUnion, and Equifax can and do instruct data-furnishers, such as SPS, on how to properly report certain accounts from time to time upon request from the DF.

153. Experian, TransUnion, and Equifax failed to conduct a reasonable investigation because any basic investigation would have included a review of Plaintiff's dispute letters.

154. Experian, TransUnion, and Equifax therefore did not do the most basic investigation regarding credit reporting industry standards otherwise the aforementioned would have been uncovered.

155. Experian, TransUnion, and Equifax intentionally, willfully or with reckless disregard for Plaintiff's accuracy, did no investigation whatsoever given that Experian, TransUnion, and Equifax's general policies are to simply parrot whatever information a data furnisher sends.

156. Such policies and procedures inherently lead to inaccurate information being reported and therefore such an investigation is wholly unreasonably and reckless i.e. willful.

**THIRD CAUSE OF ACTION**
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))
Against Defendants Experian, TransUnion and Equifax)

**Experian, TransUnion, and Equifax – Failure to Review and Consider All Relevant Information.**

157. Plaintiff realleges and incorporates herein the allegations in each and every paragraph above as though fully set forth herein.

158. Experian, TransUnion, and Equifax violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

159. As a result of Experian, TransUnion, and Equifax's violation of 15 U.S.C. § 1681i(a)(4), Plaintiff suffered actual damages, including but not limited to, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

160. The violations by Experian, TransUnion, and Equifax were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

161. In the alternative Experian, TransUnion, and Equifax were negligent, which entitle Plaintiff to recovery under 15 U.S.C. § 1681o.

162. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian, TransUnion, and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

## FOURTH CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))
Against Defendants Experian, TransUnion, and Equifax)

**Experian, TransUnion, and Equifax– Failure to Delete Disputed and Inaccurate Information.**

163. Plaintiff re-alleges and incorporates herein the allegations in each and every paragraph above as though fully set forth herein.

164. Experian, TransUnion, and Equifax violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

165. As a result of Experian, TransUnion, and Equifax's violation of 15 U.S.C. § 1681i(a)(5)(A), Plaintiff suffered actual damages, including but not limited to, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

166. The violations by Experian, TransUnion, and Equifax were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

167. In the alternative, Experian, TransUnion, and Equifax were negligent, which entitle Plaintiff to recovery under 15 U.S.C. § 1681o.

168. Plaintiff are entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian, TransUnion, and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rules of Civil Procedure 38, Plaintiff hereby demands a trial by jury for all issues triable by jury.

//

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

2. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

3. Award attorney's fees and costs of suit incurred herein pursuant to 15 U.S.C. § 1681n & o;

4. For determination by the Court that Creditor's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, et seq.; and

5. For determination by the Court that Creditor's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

**Gale, Angelo, Johnson, & Patrick, P.C.**

Dated: July 22, 2023

*/s/ Elliot Gale* (Bar # 1119904)
Elliot Gale
egale@gajplaw.com
Gale, Angelo, Johnson, & Patrick, P.C.
1430 Blue Oaks Blvd., Ste. 250
Roseville, CA 95747
916-290-7778
Attorney for Plaintiff